**STATE ex rel. GENERAL TELEPHONE COMPANY OF the MIDWEST, a corporation, Relator-Respondent,**

v.

**PUBLIC SERVICE COMMISSION of the State of Missouri, Respondent-Appellant.**

No. 27856.

Missouri Court of Appeals, Kansas City District.

May 3, 1976.

Motion for Rehearing and/or Transfer Denied June 1, 1976.

Leland B. Curtis, Commission Counsel, Michael K. McCabe, Sr., Counsel, Missouri Pub. Serv. Comm., Jefferson City, for respondent-appellant.

J. Robert Jones, William H. Schneider, Power, Jones & Schneider, Columbus, Ohio, Dale E. Sporleder, Spencer, Fane, Britt & Browne, R. W. Hedrick, Jr., Goller & Hedrick, Jefferson City, for relator-respondent.

Before TURNAGE, P. J., and WELBORN and HIGGINS, Special Judges.

ROBERT R. WELBORN, Special Judge.

Telephone service rate increase proceeding. On September 1, 1972, General Telephone Company of the Midwest filed tariffs to increase the company's annual gross revenues from Missouri operations by $1,503,322 per year. After a hearing, the Missouri Public Service Commission entered an order authorizing an increase of $846,722 per year. Midwest obtained a review of the order by the Cole County Circuit Court, which reversed the order of the commission and remanded the case to the commission for further proceedings. Commission has appealed.

General Telephone Company of the Midwest ("Midwest") operates in Iowa, Missouri and Nebraska. The Missouri division served 87,909 telephones in 46 exchanges, located largely in smaller cities. The City of Columbia is the largest urban area served by Midwest in Missouri.

Midwest is a wholly-owned subsidiary of General Telephone & Electronics Corporation ("GT&E"). Through various subsidiaries such as Midwest, GT&E provided service to 10,005,000 telephones in the United States, the largest number served by any system other than that of the American Telephone & Telegraph Company system ("Bell"). GT&E supplied service to 46.6% of the telephones served by the so-called "independent" telephone companies (non-Bell) in the United States. Its operating revenues were 49.2% of the total revenues of such independent companies.

GT&E also owned other communications, manufacturing and research companies. Manufacturing operations provided approximately the same gross income to GT&E as its telephone operations.

Among the manufacturing subsidiaries is GT&E Automatic Electric, Incorporated ("Automatic"). Automatic manufactures equipment for the telephone industry and distributes telephone and miscellaneous supplies manufactured by others. Automatic has been in business since 1891. In 1955, GT&E acquired 78% of the outstanding Automatic stock and by 1961 Automatic was wholly owned by GT&E.

Another wholly-owned subsidiary of GT&E is General Telephone Directory Company ("Directory"). It produces telephone. directories for Midwest and other GT&E affiliated customers and also nonaffiliated customers. Directory sells yellow page advertising in its customers' directories. A portion of the advertising revenues are paid to the telephone company pursuant to contract.

On this appeal, the primary question relates to the commission's treatment of transactions between Midwest and Automatic and Midwest and Directory.

In the hearing before the commission, Midwest presented evidence that the prices it paid to Automatic for equipment and supplies are as low or lower than the prices paid by nonaffiliated companies for comparable items. The commission staff witness acknowledged that this was true, but he concluded that price comparisons "are wholly unacceptable when the buyer and seller are affiliated companies" and that in such circumstances the reasonableness of the price charged the buyer by the affiliated seller must be measured by reference to an appropriate level of profit for the seller in the price charged. The commission agreed with this conclusion.

The commission found that Automatic had charged Midwest "inflated prices" for manufactured products and supplies and, based upon cost figures which would have provided an 11.5% return on equity to Automatic, the commission ordered an adjustment in the net original cost rate base by the elimination of $625,764 from the telephone plant in service and $183,355 from the reserve for depreciation. After such net adjustment of $442,409, the commission found a net original cost rate base of $35,628,646. The commission also disallowed payments from Midwest to Directory to the extent of $36,369, representing the difference between the 25.93% return on equity which the commission found to be excessive and an 11% return on equity for Directory.

On the review by it, the circuit court found that Midwest had sustained its burden of showing that the order of the commission is unlawful and unreasonable. The court held that the order was unreasonable and unlawful and in excess of the statutory authority of the commission "in that the commission attempts to regulate the affiliates of GT&E by determining the reasonableness of profits and earnings for the Directory Company and Automatic Electric"; that the transactions between Midwest and its affiliated companies were reasonable and did not have an effect on Midwest's rates or services; that the prices paid by Midwest to its affiliates for equipment and supplies were reasonable; that the order is unreasonable, unlawful, capricious and an abuse of discretion in that the commission ignored the evidence of Midwest that it pays its affiliates less for its equipment than do other telephone companies and that Midwest buys its equipment from Automatic for less than it can purchase it from others. The court further found the order unreasonable and invalid as retroactive rate making because it adjusted the value of Midwest property acquired prior to 1962, the date of the last previous rate case of Midwest considered by the commission, in which the transactions between Midwest and Automatic were approved. Finally, the court found that the rate of return allowed by the commission was confiscatory.

The question of handling of expenditures by a public utility in transactions with affiliated companies is one of the many perplexing problems which arise in public utility rate regulation.

Judicial opinions in which the problem has received recent consideration include *General Tel. Co. of Upstate N. Y., Inc. v. Lundy,* 17 N.Y.2d 373, 271 N.Y.S.2d 216, 218 N.E.2d 274 (1966); *Pacific Telephone & Tel. Co. v. Public Utilities Commission,* 62 Cal.2d 634, 44 Cal.Rptr. 1, 401 P.2d 353 (1965); *City of Los Angeles v. Public Utilities Commission,* 7 Cal.3d 331, 102 Cal.Rptr. 313, 497 P.2d 785 (1972); *Rhode Island Consumers' Council v. Smith,* 111 R.I. 271, 302 A.2d 757 (1973); *Illinois Bell Tel. Co. v. Illinois Commerce Commission,* 55 Ill.2d 461, 303 N.E.2d 364 (1973); *Pacific Northwest Bell Tel. Co. v. Sabin,* 534 P.2d 984 (Or.App.1975); *Northwestern Bell Telephone Company v. State,* 299 Minn. 1, 216 N.W.2d 841 (1974); *State ex rel. Utilities Comm. v. General Tel. of Southeast,* 281 N.C. 318, 189 S.E.2d 705 (1972).

Recent regulatory agency decisions in the field include: *Re General Telephone Co. of California,* 80 PUR 3d 2 (Cal.1969); *Re General Telephone Co. of California,* 92 PUR 3d 224 (Cal.1971); *Re General Telephone Co. of the Midwest,* 3 PUR 4th 113 (Iowa 1974); *Re Mountain States Tel. & Tel. Co.,* 1 PUR 4th 38 (Colo.1975); *Re General Tel. Co. of Illinois,* 6 PUR 4th 90 (Ill.1974).

In some states the legislature has seen fit to authorize expressly the regulatory authority to disallow unreasonable profit made in the sale of equipment or supplies to the utility by an affiliate. See § 490A.8, Iowa Code (1963). Some statutes require prior approval by the regulatory authority of contracts with affiliated suppliers. § 757.495 ORS; Wash.Code, § 80.16.020; Wis.Stat. § 196.52[3].

■ Missouri has no such statute. Therefore, if the authority of the Public Service Commission is to extend to such transactions, it must be implied from the powers otherwise expressly granted the commission. In fixing rates for telephone companies the commission is required to give "due regard, among other things, to a reasonable average return upon the value of the property actually used in the public service * * *." § 392.240 1., RSMo 1969. In ascertaining the value of telephone company property, the commission is given the power to ascertain "every fact which in its judgment may or does have any bearing on such value." § 392.270 1., RSMo 1969. Inasmuch as one of the objects of the rate-making process is the protection of the public from excessive charges by a utility, it is obvious that the commission is not required to accept, without question, any exorbitant price which a utility might see fit to pay for the various items of property which are included in the company's rate base. In *State ex rel. City of West Plains v. Public Service Commission*, 310 S.W.2d 925, 928–929 (Mo.1958), the court stated:

"[1–3] * * * It would appear that the statutory power and authority which the commission has to pass upon the reasonableness and lawfulness of rates and to determine and pass upon the question of what rates are necessary to permit a utility to earn a fair and reasonable return (§§ 392.-220, 392.230, 392.240) necessarily includes the power and authority to determine what items are properly includable in a utility's operating expenses and to determine and decide what treatment should be accorded such expense items. Cf. *State ex rel. Western Union Tel. Co. v. Public Service Commission*, 304 Mo. 505, 517, 264 S.W. 669, 672[6], 35 A.L.R. 328. * * *"

The commission has disallowed license contracts and fees charged operating utilities by a parent company. *In re Springfield City Water Co.*, 83 PUR (N.S.) 213 (Mo.1949); *P.S.C. v. Kansas City P. & L. Co.*, 30 PUR (N.S.) 193 (Mo.1939); *P.S.C. v. Empire Dist. Elec. Co.*, 10 PUR (N.S.) 302 (Mo.1935); *P.S.C. v. Missouri Southern P. S. Co.*, 6 PUR (N.S.) 269 (Mo.1934).

In *State ex rel. Southwestern Bell Telephone Co. v. Public Service Commission*, 233 S.W. 425 (Mo. banc 1921), the court upheld the action of the commission in fixing rates in which it required Southwestern Bell to justify the amount of toll charge paid its corporate parent, A. T. & T. In refusing to disturb the commission's action, the court stated: "Probative force is given to this conclusion in view of the relation of the appellant to the American Telegraph & Telephone (sic) Co." 233 S.W. 432. The court also upheld the action of the commission in disallowing 55% of the 4½% gross revenues paid A. T. & T. as rent for telephone equipment. 233 S.W. 434–435.

As pointed out by respondent and acknowledged by appellant, the United States Supreme Court reversed this decision. *Missouri ex rel. Southwestern Bell Telephone Co. v. Public Service Commission*, 262 U.S. 276, 43 S.Ct. 544, 67 L.Ed. 981 (1923). The reversal was premised upon the conclusion that the rates set by the commission were confiscatory. The court took note of the disallowance of a portion of the rental paid to American Telephone & Telegraph, stating (262 U.S. 288–289, 43 S.Ct. 546–547):

"The important item of expense disallowed by the commission—$174,048.60—is 55 per cent. of the 4½ per cent. of gross revenues paid by plaintiff in error to the American Telephone & Telegraph Company as rents for receivers, transmitters, induction coils, etc., and for licenses and services under the customary form of contract between the latter company and its subsidiaries. Four and one half per cent. is the ordinary charge paid voluntarily by local companies of the general system. There is

nothing to indicate bad faith. So far as appears, plaintiff in error's board of directors has exercised a proper discretion about this matter requiring business judgment. It must never be forgotten that while the state may regulate, with a view to enforcing reasonable rates and charges, it is not the owner of the property of public utility companies, and is not clothed with the general power of management incident to ownership. The applicable general rule is well expressed in *State Public Utilities Commission ex rel. Springfield v. Springfield Gas & Electric Co.,* 291 Ill. 209, 234, 125 N.E. 891:

" 'The commission is not the financial manager of the corporation, and it is not empowered to substitute its judgment for that of the directors of the corporation; nor can it ignore items charged by the utility as operating expenses unless there is an abuse of discretion in that regard by the corporate officers.' "

However, that such pronouncement did not lay down the only test is clear from the later case of *Smith v. Illinois Bell Tel. Co.,* 282 U.S. 133, 51 S.Ct. 65, 75 L.Ed. 255 (1930). In that case the court stated (282 U.S. 151–153, 51 S.Ct. 70):

"Other questions are presented growing out of the relation of the Illinois Company to the Western Electric Company and to the American Company. While the Illinois Company is a distinct corporate organization, it has the advantage of being a component part of a large system to which the benefits of its operations accrue. Through this relation the Illinois Company obtains the cooperation of the manufacturing, research, engineering and financing departments of the American Company. This does not alter the fact that the Illinois business is to be treated as a segregated enterprise. If a single individual or corporation, having a number of technical staffs, engaged directly in local public services within several States, each State would be entitled to regulate the transactions within its own domain according to its own conception of public policy, provided there were no infringement of the fundamental rights guaranteed by the Federal Constitution, and, if the latter were invoked by reason of the action of any State, it would still be necessary to consider the local enterprise separately and to make whatever apportionments were necessary in that view. The corporate organization of the Illinois Company not only created a legal person amenable as such to governmental authority, but facilitates the examination of the particular transactions subject to that authority. The question presented in the present case is not one of the abuse of intercorporate relations, or of domination or control affecting the integrity of the direction of the affairs of the Illinois Company, but of alleged confiscation through prescribed intrastate rates.

"Contentions of the appellants in this relation are directed to the purchases from the Western Electric Company and to the payments to the American Company under what is called its 'license contract.' It appears that the Illinois Company has purchased practically all its equipment from the Western Electric Company. The state commission in laying the basis for its rate order made no finding as to the fairness of the prices on such purchases. On the record in this suit, the court concluded that the City had failed to support its contention that these prices were exorbitant. The court said that it appeared that for the past fourteen years the average profit of the Western Electric Company on its total business had not been 'in excess of seven per cent. and never above ten per cent.' That fact has evidentiary value but the finding does not go far enough. The Western Electric Company not only manufactured apparatus for the licensees of the Bell system but engaged in other large operations and it cannot be merely assumed or conjectured that the net earnings on the entire business represent the net earnings from the sales to the Bell licensees generally or from those to the Illinois Company. Nor is the argument of the appellants answered by a mere comparison of the prices charged by the Western Electric Company to the Illinois Company with the higher prices charged by other manufacturers for comparable material, or

by the Western Electric Company to independent telephone companies. The point of the appellants' contention is that the Western Electric Company, through the organization and control of the American Company, occupied a special position with particular advantages in relation to the manufacture and sale of equipment to the licensees of the Bell system, including the Illinois Company, that is, that it was virtually the manufacturing department for that system, and the question is as to the net earnings of the Western Electric Company realized in that department and the extent to which, if at all, such profit figures in the estimates upon which the charge of confiscation is predicated. We think that there should be findings upon this point."

■ Certainly, in view of the *Smith* case, the *Southwestern Bell Telephone* case cannot be considered to have laid down a "constitutional requirement that prevailing market prices must be accepted as the standard for testing the reasonableness of operating costs." *General Telephone Company of Upstate New York v. Lundy*, 17 N.Y.2d 373, 271 N.Y.S.2d 216, 223, 218 N.E.2d 274, 279 (1966).

The respondent concedes that the commission, for the purpose of fixing rates, may disallow excessive and unreasonable payments. Its position basically is that because in the 1962 rate case the commission ceased its examination into transactions between Midwest and Automatic, upon concluding that the prices paid by Midwest to Automatic were as low or lower than those paid by a nonaffiliated purchaser, the commission in this case should have done likewise, and for it to go further and inquire into the profitability of such transactions amounts to regulation of Automatic and Directory for which the commission has no authority.

■ Considering the latter argument, the commission did not by its order regulate the affairs of Automatic and Directory. All that it did was regulate the amounts which Midwest paid those companies insofar as it affected the reasonableness of Midwest's rates. Midwest is the only party subjected to the order of the commission. Respon-

dent asserts that it cannot pay prices it cannot get allowed in rate cases and: "The alternative, if Respondent-Appellant prevails, is to pay *higher* prices to nonaffiliates." Such a threat of self-defeating action hardly rises to the level of a legal argument.

Respondent has cited the case of *State ex rel. City of St. Joseph v. Public Service Commission*, 325 Mo. 209, 30 S.W.2d 8, 14–15[10–13] (banc 1930), in which the court, in rejecting an argument that a fee paid by a water company to its parent should be disallowed, emphasized the right of the manager of the company to control the methods of rendering service. That was a case in which all of the evidence pointed to the beneficial results of the arrangement there questioned and the commission had apparently accepted such evidence and approved the arrangement. In the St. Joseph case the court stated: "The company has a lawful right to manage its own affairs and conduct its business in any way it may choose, *provided that in so doing it does not injuriously affect the public*." (emphasis supplied) 30 S.W.2d 14. Here the commission in effect has found that the dealings between Midwest and Automatic and Directory did "injuriously affect the public." Whether or not the evidence supports that finding presents another question, to be considered later.

■ Insofar as the conclusion in the 1962 case is concerned, it has no binding effect in a future rate case. A concise statement of the applicable rule is found in 2 Davis, Administrative Law Treatise § 18.09, 605, 610 (1958), as follows:

" * * * For an equity court to hold a case so as to take such further action as evolving facts may require is familiar judicial practice, and administrative agencies necessarily are empowered to do likewise. When the purpose is one of regulatory action, as distinguished from merely applying law or policy to past facts, an agency must at all times be free to take such steps as may be proper in the circumstances, irrespective of its past decisions. * * *

Even when conditions remain the same, the administrative understanding of those conditions may change, and the agency must be free to act * * *." (Footnotes omitted.)

Clearly the commission in this case was not bound by the action in the 1962 case.

The commission's order, in addition to having been authorized by law, must have been supported by competent and substantial evidence. The circuit court found that it was not and respondent here supports that conclusion.

The commission's findings of fact on this issue are as follows:

"Company contends that its relationship with Automatic is one of supplier and customer, that it is not committed to buy from any particular manufacturer or supplier and that it obtains 'uniform high quality materials at the lowest price.' Company urges that its transactions with Automatic be judged by a reasonableness standard and the mere fact of affiliation should be discounted if they are reasonable. The test suggested is whether 'the prices paid by the Company for equipment and supplies to affiliates are as low or lower than prices paid by non-affiliates for comparable items.' In support of this test, Company offered evidence that tended to prove that the prices it paid for equipment and supplies were as low or lower than the prices charged to independent or non-Bell companies.

"We cannot accept this contention. To hold that the Company's transactions with Automatic are reasonable merely because Automatic charges similar prices to non-affiliates is to ignore the realities of the market in which Automatic competes.

"Sixty five percent (65%) of the independent (non-Bell) telephones are owned by companies with manufacturing subsidiaries similar to Automatic. General owns 46.6 percent of this total. Companies without affiliates constitute the remaining 34.4 percent of the independent market. This 34.4 percent of the market is spread among 1700 companies. Two factors became readily apparent. General Telephone Companies dominate the independent market and the market for non-affiliated independent telephone companies is fragmented.

"From its position of overwhelming dominance of the independent market, the G.T.&E. system could virtually dictate prices. From 1956 to 1971 General purchased 96.66 percent of its equipment and supplies from Automatic and in 1972 it purchased 94.5 percent. 77.84 percent of Automatic's total sales are to the G.T.&E. system and this figure is increasing. Clearly Automatic is dependent upon the General system. The G.T.&E. system should be able to command considerable price concessions from its dominant bargaining position. Yet, the evidence produced by the Company reveals that its price comparisons are based on catalogue or list prices. It is difficult to believe that there can be a rational comparison of prices on this basis. While there is some evidence that Automatic does give limited discounts to G.T.&E. system companies, it is far from convincing.

"The evidence produced by Company on discounting revealed Automatic has no systematic discounting policy and the frequency and amount of discounting is arrived at by the 'judgment of management' rather than a rational discounting policy based on the economic realities of mass purchasing by a dominant consumer.

"If the affiliated G.T.&E. system companies, as a single bargaining unit, were free to purchase their equipment and supply needs from the lowest bidder in a truly competitive market, we believe lower prices could be obtained than those that have been charged by Automatic in the past. In that event, the benefit of mass buying would accrue to the customers of Company rather than to its parent, G.T.&E.

"Company has failed to produce convincing evidence that the prices charged by Automatic for equipment and supplies are reasonable. In view of the realities of the market place, the test offered by Company is not a proper one. We do not believe that the prices charged by Automatic have been reasonable. It will therefore be necessary to adjust the rate base of Company to compensate for past overcharges."

■ The statistical data included in the findings are not questioned. What is questioned is the commission's conclusion, based upon such data and the record testimony that the cost-comparison test, urged by Midwest, is not a proper standard for determining the reasonableness of the transactions between Midwest and Automatic and Directory. The circuit court agreed with respondent that such findings were based upon surmise and speculative evidence. In this court, respondent points to specific findings and the testimony which it says is the sole support for the particular finding and concludes that the trial court correctly assessed the value of the supportive testimony. Thus, on the finding: "The G.T.&E. system should be able to command considerable price concessions from its dominant bargaining position," respondent points to the testimony of staff witness Burkhardt that it is his opinion that the volume of GT&E purchases should result in "tremendously discounted prices from the prices that a smaller purchaser would receive." This, however, is not the only testimony which would support the commission's finding. Respondent's witness Kircos was asked " * * * [A] 46.6 percent interest in the market if operating as a unified whole would have a considerable impact on prices and on pricing policies within the industry?" He replied, "Acting as one purchasing body it could; yes." Again, in support of the claimed benefit of the GT&E—Automatic affiliation, Kircos stated: "Automatic, because of its volume purchases for resale to both affiliates and non-affiliates, has been able in the case of many supply items to arrange large quantity discounts." This court must reject the contention that the specific finding above quoted was not supported by competent and substantial evidence.

The next finding specifically attacked is that, if GT&E affiliated companies were free to act as a unit in a competitive market, "lower prices could be obtained than those that have been charged by Automatic in the past." This was a conclusion which the commission could reasonably reach on the basis of the evidence. Competition is recognized as a desirable and effective means of price control. Here there was no evidence of competition for the business of the GT&E affiliates. Because of the affiliation, GT&E operating companies, such as Midwest, looked to Automatic as the source of their requirements for equipment and supplies. In the 1956–1971 period, Midwest made 96.66% of its purchases from Automatic. The absence of competition and the leverage which the combined purchasing power of the GT&E operating affiliates might exert in a freely competitive market, viewed in the light of the high profitability of Automatic's operation, adequately support the commission's finding.

■ Respondent attacks the finding that comparison of prices paid Automatic by GT&E affiliates with prices paid by non-affiliates is unacceptable because such comparison would ignore the realities of the market in which Automatic competes. Respondent asserts that this conclusion can find support only in an expression of opinion by witness Burkhardt. The opinion of a qualified expert may amount to substantial and competent evidence. 2 Am.Jur.2d, Adm.Law, § 395, p. 201 (1962). Neither before the commission nor the courts have Burkhardt's qualifications been questioned. Even without Burkhardt's opinion, the commission would have been able to arrive at such conclusion, based primarily upon the fragmented market among the 1700 nonaffiliated independent telephone companies contrasted with the concentrated, controllable buying power of the GT&E affiliates.

■ Finally, respondent challenges specifically the commission's rejection of catalogue or list prices as the basis of price comparisons. Respondent asserts that this finding is supported only by hearsay testimony of Burkhardt. Aside from Burkhardt's testimony, respondent's witness Kircos testified that, although Automatic did not discount from its two published price lists, one for affiliated and one for nonaffiliated purchases, it did give one nonaffiliate the benefit of the lower affiliated price list. Although Kircos stated that Automatic does

not offer discount from its published lists, it is obvious that the benefit afforded the one nonaffiliate is in practical effect a discount. Furthermore, the Midwest witness Manley, who produced the exhibit comparing Automatic and other suppliers' prices, acknowledged that some of the other suppliers do give volume discounts. Again, support for the finding attacked is not limited to Burkhardt's testimony.

■ Inasmuch as the commission's rejection of the test advanced by Midwest was based upon competent and substantial evidence of record, the adoption by the commission of a different measure of the reasonableness of the expenditures in question cannot be said to have been arbitrary or capricious or unauthorized by law. If the commission has the power and duty to inquire into the reasonableness of the transactions in question, the commission, as the repository of the legislative rate-making power entrusted to it, has the right to determine a reasonable standard of judgment consistent with statutory and constitutional limitations. The limited authority of a court upon judicial review of the commission's action does not encompass a substitution by the reviewing judicial authority of its judgment for that of the commission. That, in essence, is what the circuit court did in this case and therein it erred.

Given the legal and factual basis for the commission's determination that the profitability of the transactions should be the measure of their reasonableness, the problem remains as to whether the conclusion that the profits were unreasonable and justified the adjustment ordered was supported by substantial and competent evidence.

Staff witness compared the return on equity for Automatic with the records of electrical equipment and electronics manufacturing groups and also with broad general industrial groups. Although acknowledging that Automatic and Western Electric are not wholly comparable, a comparison with that company was also presented. The witness found Automatic's average return on equity for the years 1962–1971 to

have been 22.4%. The average return of various electrical and electronics groups for the same period ranged from 11.2% to 12.0%. The returns of larger general groups of industrial concerns averaged between 10.6% and 12.4% for the same period. The average return on equity for Western Electric for the period was 10.5%.

Comparing net income as a percentage of sales for the same period, Automatic's return was 7.5%. Western Electric averaged a return of 4.6%. The broader spectrum industrial groups had an average return of between 4.7% and 6.0%. The electrical and electronic groups had an average return of from 4.2% to 4.6%.

The evidence on behalf of Midwest showed a return on equity for the period in question of from 9.95% to 12.01%, the latter figure for 1971. The difference between Midwest's evidence and staff testimony arose from a difference as to the treatment of goodwill on a part of GT&E's equity in Automatic. The staff ignored goodwill which Midwest claimed amounted to some $93,000,000. Its return on equity figures was based upon a 40-year amortization of goodwill.

The commission rejected both approaches. It did conclude that $34,725,000 goodwill should be included in the computation of the GT&E equity in Automatic, to be amortized over a 25-year period.

■ This court cannot say that the commission's conclusion that Midwest was charged "inflated" prices by Automatic was not supported by substantial and competent evidence. The comparison evidence presented permitted the commission to find that Automatic did receive excessive profits and was able to obtain such return with a limited degree of risk, attributable to its relationship with GT&E and its affiliated companies.

The rate of return on equity of 11.5%, which the commission found to be reasonable and to be applied as the basis for adjusting the value of Midwest's plant, was, as the commission found, "in the ten-twelve percent return which is considered to be the norm."

With respect to Directory, the commission made the following findings:

"1. *Directory Revenues.* Company's transactions with its affiliate, Directory, presents an issue closely analogous to that raised by its transactions with Automatic. Directory, according to Company, provides a necessary and specialized service. Company contends that there are only a few months in the year, just prior to the issuance of new directories, that the services of Directory are required and that it would be uneconomical for it to maintain a staff to perform these seasonal functions. In light of the specialized nature of Directory's services the prices charged by Directory are reasonable.

"Staff points out that Directory has one hundred percent of the G.T.&E. system's business; that in 1972 77.7 percent of Directory's total revenue was derived from transactions with affiliated companies; that from 1968 to 1972 Directory had an average return on equity of 27.6 percent; and that in the test year Directory earned 25.93 percent return on equity. Staff contends that the prices charged by Directory has no comparable competitors and deals primarily in a captive market.

"We find that Company failed to carry its burden of proof on the issue of the reasonableness of prices charged by Directory. We find that an adjustment to miscellaneous revenue in the test year will be necessary to compensate for these over-charges.

"In view of Directory's relationship with and dependence upon Company, we find it appropriate to make an adjustment in an amount equal to the excess in return on equity over the norm for a corporation the nature of Directory in the broad spectrum of American industry and commerce. We find that eleven percent return on equity to be proper. We feel that risks attendant to Directory's Operations are less than those attendant to a manufacturer like Automatic. We are also mindful of the nature of the financing required by Directory and point out that less debt is necessary than is required for a manufacturing concern such as Automatic. Therefore, an adjustment in

the sum of $36,369 is necessary to reflect the excess in earnings represented by the difference in 25.93 percent return on equity actually earned in the test year and the eleven percent return on equity we deem appropriate."

Midwest's objection to these findings is based largely upon the commission's rejection of its evidence designed to show that the arrangement between Directory and Midwest was fair and reasonable. That evidence was aimed to show that Directory provided a specialized service for the operating arms of GT&E more economically than such operating companies might do if they had their own directory staff.

■ Again the commission had the right and duty to weigh such evidence against the evidence that the arrangement between Directory and Midwest was arrived at in a noncompetitive manner. The commission had evidence that Directory's net income from its nonaffiliated competitive business was half the rate of the income from its affiliated business. When asked why it is so much more profitable for Directory to deal with affiliated companies, the company witness stated that he could not answer the question. Upon the entire record, the finding of the commission is not lacking in evidentiary support.

■ Respondent does have reason to complain that the record does not disclose the figure arrived at by the commission for the value of Automatic upon which it determined the rate of profit found to be reasonable should be applied. Nor does the record disclose how the commission arrived at its figure of $34,725,000 as goodwill to be included in the GT&E equity in Automatic. Finally, the record further fails to disclose how the commission arrived at the adjustment in the rate base and depreciation, based upon the transactions with affiliates. The staff did present an exhibit which detailed the adjustment based upon the staff recommendation that goodwill be disallowed. That recommendation was not followed, and the record does not show the

recomputation, based upon the value, likewise not shown, of the GT&E equity in Automatic. The matter must be remanded to the commission for a further hearing for determination of these matters. *State ex rel. City of St. Louis v. Public Service Commission,* 341 Mo. 920, 110 S.W.2d 749 (banc 1937).

■ The circuit court also sustained the respondent's contention that the order of the commission was retroactive rate making, inasmuch as it adjusted the value of respondent's property purchased from Automatic back to 1956. The circuit court erred in so concluding. The order of the commission in no manner affected the rates which Midwest had previously charged and received from its customers. The order merely held that future rates must be adjusted to take cognizance of the inflated profits resulting from its affiliate's dealings. This is not retroactive rate making.

■ The circuit court also agreed with respondent's contention that the rate of return allowed by the commission was confiscatory and failed to allow a fair rate of return to Midwest. The following shows the rates of return here involved:

|  | Prior Rate | Company Request | Commission Allowed |
|---|---|---|---|
| On Common Equity | 8.79% | 13.80% | 11.5% |
| On Net Original Cost | 7.42 | 9.56 | 8.58 |
| On Fair Value | 7.30 | 9.41 | 8.44 |

In this court respondent would support the trial court's finding on this issue on the grounds that the returns allowed by the commission were predicated upon an embedded cost of long term debt of 6.94% and of short term debt of 6.75%, both of which were below the prime rate at the time of the order. Respondent argues that "as short term debt is renewed or otherwise refinanced, the interest cost goes up and the Company is immediately prevented from even earning what the Commission authorized."

Respondent does not deny that the record contains evidentiary support for the rates of return allowed by the commission. Although the commission did not make an express allowance for "surplus and contingencies," the commission's order evidenced an awareness that such consideration was required in arriving at a fair return for Midwest. This court will not presume that the commission ignored these factors in arriving at the rate of return. There was no evidence that major debt financing was in the immediate plans of Midwest. Short term interest rates do fluctuate, but the commission is not required to be prescient in this regard and attempt to predict the future course of such rates. The traditional test year concept employed by the commission has not been shown to have been unreasonable. Respondent failed to sustain its heavy burden of overcoming the commission's finding on the rate of return. The circuit court erred in concluding otherwise.

The judgment of the circuit court is reversed. The cause is remanded to that court with directions to enter a new judgment affirming the order of the commission except insofar as the order failed to disclose the value of Automatic, how the goodwill to be included in such value was determined and how the commission arrived at the adjustments in the rate base and depreciation, based upon the transactions with affiliates, and ordering further proceedings with respect to such matters in accordance with the views herein expressed.

Reversed and remanded.

All concur.