617 P.2d 1242

The WASHINGTON WATER POWER
COMPANY, Appellant,

v.

IDAHO PUBLIC UTILITIES
COMMISSION, Respondent.

In the Matter of the Application of the
WASHINGTON WATER POWER COM-
PANY for an Order Approving Revised
Rates and Charges for Electric Service
in the State of Idaho.

No. 13032.

Supreme Court of Idaho.

Oct. 6, 1980.

Paul D. McCabe, Coeur d'Alene, Robert L. Simpson of Paine, Lowe, Coffin, Herman & O'Kelly, Spokane, Wash., for appellant.

David H. Leroy, Atty. Gen., Mary Ann Johnson, Deputy Atty. Gen., Boise, for respondent.

BISTLINE, Justice.

Between 1957 and 1960, the Washington Irrigation and Development Company (WIDCo) (a wholly owned subsidiary of appellant Washington Water Power (WWP)) and Pacific Power & Light Co. (PP&L) jointly acquired coal reserves located in Thurston and Lewis Counties, Washington, with the intent to eventually build a coal–fired electricity–generating power plant adjacent to the coal reserves. About 1967, the parties determined that the time had arrived to build and operate the power plant (named the Centralia Plant). Six other entities in addition to WWP and PP&L chose to participate in the plan. The degrees of ownership are as follows: PP&L 47½%; WWP 15%; Puget Sound Power & Light Co. 7%; Portland General Electric Co. 2½%; P.U.D. No. 1 of Grays Harbor County 4%; P.U.D. No. 1 of Snohomish County 8%; Seattle 8%; and Tacoma 8%. It was also determined that PP&L would operate the generating plant while WIDCo would operate the mine.

WIDCo's mining operations were financed by the sale of additional common stock to WWP and by the issuance of first mortgage bonds to insurance companies. WWP paid for its acquisition of additional WIDCo stock through its shareholders' retained earnings, which retained earnings had accrued to WWP almost completely through the profits of its utility operation.

The Centralia plant commenced producing electric power in 1971. However, the plant did not begin full operation until Sep-

tember, 1972. WIDCo lost money on its coal sales in 1971, 1972 and 1974; its average return on investment for the period 1972 through 1976 was only 3.07%. For 1976, WIDCo's return on its investment was 10.4%, which equates to a return on its equity of 20.4%. For the twelve month period ending June 30, 1977, this return on equity increased to 22.6%.

The price of the coal sold by WIDCo to Centralia was set in a long term contract dated October 30, 1970. Under this contract, the owners of Centralia agreed to purchase all of their coal requirements from the WIDCo operated mine until September 1, 2006. This contract not only establishes a base price, but also provides for several automatic increases in the price of coal should certain expenses increase, such as increases in labor cost, increases in taxes other than income taxes, increases in cost due to changes in regulation, or increases in cost due to any union administered welfare, pension or benefit fund. Under § 6.(f)(i) of the agreement, WIDCo could at any time give six months' written notice of an intent to increase the price for any other reason. After this notice, a majority (based on ownership percentages) of those owners of the Centralia plant not having an interest in the coal fields may either insist on arbitration or force WIDCo to sell its interest.

On July 15, 1977, WWP applied to respondent Idaho Public Utilities Commission (Commission) for approval of revised electric rates designed to produce approximately $7 million of additional electric revenue annually for Idaho operations. By order dated August 2, 1977 (No. 13292), the Commission suspended WWP's revised rates for six months. Several hearings were held, and on February 3, 1978, without benefit of notice or a separate hearing, the Commission ordered that the effective date of the revised rates be extended an extra sixty days due to the size of the requested rate increase, the complexity of the cases presented by WWP and the Commission's work load at that time (Order No. 13697). On April 14, 1978, the Commission in Order No. 13856 rejected the filed rates, authoriz-

ing WWP to file rates designed to produce an additional $3,847,000 annually. Pertinent here, the Commission held that WWP had failed to sustain its burden of proof that the price paid for WIDCo coal was just and reasonable. The Commission therefore fixed an alternative price for WIDCo coal sold to WWP to generate electricity for Idaho ratepayers, limiting it to that price which would allow a 13.25% return on subsidiary equity, the same return allowed to WWP. The Commission found that WWP's 15% ownership in the Centralia plant is supported solely by WIDCo's 50% ownership of the coal mine, and that therefore 30% of WIDCo's earnings can be traced to coal purchases by WWP. The Commission thus took 30% of WIDCo's earnings above the 13.25% return on equity figure and added that to the net operating income of WWP. In this manner the Commission limited the effective price paid by WWP for WIDCo coal based on WIDCo's earnings, without directly setting the price that WIDCo may charge for coal. WWP appeals from that order and from the order (No. 13959) denying its petition for rehearing.

On appeal, WWP lists six issues. Five of those issues, however, are simply sub–issues of the main question of whether the Commission erred in denying as an operating expense part of the sums paid by WWP to WIDCo for coal. The sixth issue, which we will deal with first, is whether the Commission has authority under I.C. § 61–622 to extend the period of suspension of WWP's revised rates for an additional sixty days without notice to WWP and without providing WWP an opportunity to be heard on the record.

I.

The Commission first argues that WWP never petitioned for a rehearing from Order No. 13697, the order suspending the effective date of the proposed tariffs for an additional sixty days, and that therefore this issue cannot be considered on appeal. *See Key Transportation, Inc. v. Trans Mag-*

ic Airlines Corp., 96 Idaho 110, 524 P.2d 1338 (1974); *Idaho Underground Water Users Ass'n v. Idaho Power Co.*, 89 Idaho 147, 404 P.2d 859 (1965); I.C. § 61–626. However, WWP did raise this issue in its petition for rehearing from Order No. 13856, the substantive order denying part of the requested rate relief. Although the Commission found that it was improper for WWP to raise this issue for the first time in a petition for rehearing from Order No. 13856, nonetheless the Commission did consider the issue and reaffirm the correctness of its suspension.

■ The policy requiring that objections be presented to the Commission in a petition for rehearing before this Court will consider them is as follows:

"The purpose of an application for the rehearing provided by statute, and it must be presumed to have a useful purpose, is to afford an opportunity to the parties to bring to the attention of the Commission, in an orderly manner, any question theretofore determined in the matter, and thereby afford the Commission an opportunity to rectify any mistake made by it before presenting the same to the Supreme Court." *Idaho Underground Water Users Ass'n v. Idaho Power Co.*, 89 Idaho 147, 154, 404 P.2d 859, 862 (1965) (quoting *Consumers' Co. v. Public Utilities Commission*, 40 Idaho 772, 775, 236 P. 732, 732–33 (1925)).

In the present case, since the Commission did have the opportunity to consider WWP's objections to the additional sixty day extension, we in turn will consider the Commission's decision on this issue.

I.C. § 61–622 provides as follows:

"No public utility shall raise any rate . . . except upon a showing before the commission and a finding by the commission that such increase is justified. The commission shall have power . . . to enter upon a hearing concerning the propriety of such rate . . . and pending the hearing and decision thereon, such rate . . . shall not go into effect; provided, that the period of suspension of such rate . . . shall not extend beyond thirty (30) days

when such rate . . . would otherwise go into effect, pursuant to section 61–307, Idaho Code, unless the commission in its discretion extends the period of suspension for an initial period not exceeding five (5) months, *nor unless the commission after a showing of good cause on the record grants an additional sixty (60) days* ; provided further, that prior to the expiration of said periods of suspension the commission may, with the consent in writing signed by the party filing such schedule, permanently or further suspend the same. On such hearing, the commission shall establish the rates . . . proposed, in whole or in part, or others in lieu thereof, which it shall find to be just and reasonable." (Emphasis added.)

The italicized clause providing for the additional sixty day suspension was added by the legislature in 1976 Idaho Sess. Laws ch. 263, § 1.

WWP argues that by adding this clause the legislature meant to require proper notice, an opportunity to be heard, and a showing of good cause before the additional sixty day suspension could be granted. WWP bases this argument on the fact that the initial suspension can be at the Commission's discretion, but the legislature specifically provided that the additional sixty day suspension must be for "a showing of good cause on the record."

■■ There is another interpretation of this language, however, which we find to be more reasonable. The initial suspension has no requirement of being on the record, for there is no record at the time of deciding the initial suspension. And the words "a showing of good cause on the record" can be read to mean only that the record in the case must disclose that the additional days are necessary, as opposed to allowing the Commission to act with absolute discretion. We feel that this is the reading intended by the legislature. Absent an explicit legislative directive to that effect, we will not impose upon the Commission an additional hearing for the sole purpose of determining whether the additional sixty day suspension should be given. The position advanced by

WWP could likely result in many of the additional sixty days being utilized solely in determining whether to grant the additional days. We decline to adopt such a position. Here the Commission determined *from the record* that good cause existed to suspend the rates for the additional sixty days because of the size of the increase requested, the complexity of the cases presented by WWP and the workload of the Commission at that time. No challenge has been made to these findings, and we hold that the Commission acted properly.

## II.

The next question is whether WWP received adequate notice (1) that the expense incurred for coal purchased from WIDCo would be an issue and (2) that limiting the charge for WIDCo coal to a price which would allow the same return on subsidiary equity as allowed on utility equity would be one of the approaches considered. While "[n]otice is rightfully considered to be a critical aspect of due process to be afforded in any administrative process," *Grindstone Butte Mutual Canal Co. v. Idaho Power Co.*, 98 Idaho 860, 865, 574 P.2d 902, 907 (1978), we find sufficient notice in the present case.

"The procedure chosen by the Commission must of course give the parties fair notice of exactly what the Commission proposes to do, together with an opportunity to comment, to object, and to make written submissions . . . ." *Intermountain Gas Co. v. Idaho Public Utilities Commission*, 97 Idaho 113, 129, 540 P.2d 775, 791 (1975) (quoting *American Public Gas Ass'n v. Federal Commission*, 498 F.2d 718, 722 (D.C.Cir. 1974)).

In Order No. 13115, dated April 27, 1977, given in response to WWP's rate request previous to the one at issue here, the Commission stated the following:

"Based on the record before us we do find that Applicant, the subsidiary, the Commission Staff and all intervenors had sufficient notice of the proposed change. [In reference to whether the Commission should assert jurisdiction over WIDCo.] But after a full and complete review of this record, we are not fully convinced by either side's arguments or evidence. Therefore, we are going to reserve our final ruling on the status of WIDCo until the next rate case. Applicant should clearly understand that this reserved ruling is without prejudice to any subsequent Commission determination of jurisdiction. It is further intended that this reserved ruling is without prejudice to any future rate-making methodology the Commission might apply or adopt in evaluating the reasonableness of the price applicant pays for services or commodities purchased from one of its nonconsolidated subsidiaries. We believe that any contractual relationship between a parent and subsidiary that involves the purchase of services or commodities which will eventually be paid for by the utility's customers requires thorough investigation by this Commission to determine the fairness and reasonableness of the charges.

. . . . .

"The current coal contract between Applicant and WIDCo results in a price for coal which provides WIDCo a 15% return on total subsidiary equity. From the evidence presented by Applicant we cannot find that the WIDCo coal mining operation carries an investor risk in excess of that we have found for Applicant, nor can we find that Applicant has satisfied its burden of proof on the unreasonable profits issue.

"In this general rate case we have allowed Applicant a 13% return on equity. Therefore, for the purposes of this case, we find that the charge for WIDCo coal provided Applicant to generate electricity for Idaho ratepayers should be limited to that price which will allow a 13% return on subsidiary equity."

Moreover, the Commission in the present case found that the "direct testimony of the applicant . . . which was prefiled at the time of the application is inconsistent with the argument that the applicant had no notice that the Commission would seek to reduce the expenses attributable to WIDCo

coal," and WWP has offered no evidence to contradict that statement, just as it has not suggested any specific additional evidence that it would have offered.

 Although, as conceded by the Commission, the notice of hearing would have been more thorough had it been more specific with regard to the WIDCo incurred coal expense, nonetheless we find that WWP had sufficient actual notice that its coal expense would be an issue in this case to satisfy the requirements of due process. WWP similarly had sufficient notice that the return on equity approach might be adopted if the price were found to be unreasonable, as that was the very approach adopted by the Commission in WWP's last rate case.[1]

### III.

The next and major issue is whether the Commission erred in concluding that WWP had not made out a prima facie case that the price it paid for WIDCo coal was reasonable. Before reaching that question, however, we must decide whether it is for this Court or the Commission to set the standard for determining "reasonableness," and we must set forth our standard of review in this type of case. At the outset, we note that this question of the reasonableness of expenses paid to affiliates is one of the more perplexing problems which arise in public utility rate regulation, and that it has received differing treatment from different courts and utility commissions.

Under one approach, called the "California approach" after the state which developed it, the affiliate is treated as part of the utility for rate-making purposes. The theory underlying this approach is that where a utility enjoys an integrated position and market dominance, it "should not be permitted to break up the utility enterprise by the use of affiliated corporations and thereby obtain an increased rate of return for its activities." *City of Los Angeles v. Public Utilities Commission*, 7 Cal.3d 331, 102 Cal.Rptr. 313, 323, 497 P.2d 785, 795 (1972). Thus under this approach the question of whether the prices are reasonable is immaterial; all integrated parts of the utility are allowed the same rate of return. For examples of cases utilizing this approach, see *City of Los Angeles v. Public Utilities Commission, supra*; *Pacific Telephone & Telegraph Co. v. Public Utilities Commission*, 62 Cal.2d 634, 44 Cal.Rptr. 1, 401 P.2d 353 (1965); *Illinois Bell Telephone Co. v. Illinois Commerce Commission*, 55 Ill.2d 461, 303 N.E.2d 364 (1973); *Re New England Telephone & Telegraph Co.*, 13 P.U.R. Fourth 65 (Me. 1976). *See generally* Note, Treatment of Affiliated Transactions in Utility Rate Making: Western Electric Company and the Bell System, 56 Boston U.L.Rev. 558, 568–71 (1976).

The majority approach, called the "traditional approach," on the other hand, views the affiliate as an independent entity and compares the prices and levels of profits on the affiliated transactions with the prices and profits of comparable enterprises. While some cases seem to hold that the fact that the price charged the utility is the same as that charged to independent enti-

---

1. As noted in *Intermountain Gas Co. v. Idaho Public Utilities Commission*, 97 Idaho 113, 129, 540 P.2d 775, 791 (1975):

"When Intermountain filed a proposed tariff or rate increase it was necessarily put upon notice that the Commission would consider the questions traditionally raised in rate-making, such as the allowance for working capital and the allowable rate of return. Furthermore, Intermountain could reasonably be expected to anticipate that the Commission might compel Intermountain to segregate its utility and non-utility businesses, separating its capital investment in the retail sales business from the rate base and requiring the

losses in the retail sales business to be borne by its shareholders and not spread among its utility customers."

Similarly, it would seem that when the utility applies for a rate increase it would naturally follow that the reasonableness of expenses it pays for goods, especially those paid to subsidiaries, would be at issue, and, if the expenses were found to be unreasonable, that various options to evaluate the expenses, such as a return on equity approach, would be considered. However, due to the Commission's prior order, we do not need to base our conclusion on this analysis.

ties establishes that the price is reasonable, e. g., *State v. General Telephone Co.*, 281 N.C. 318, 189 S.E.2d 705 (1972); *Montana–Dakota Utilities Co. v. Public Service Commission*, 102 N.W.2d 329 (N.D. 1960), other cases hold that the controlling factor is whether the subsidiary's profits are fair for it, regardless of equivalent prices.[2] *E.g., Central Louisiana Electric Co. v. Louisiana Public Service Commission*, 373 So.2d 123 (La. 1979); *General Telephone Co. v. Public Service Commission*, 537 S.W.2d 655 (Mo. App. 1976); *General Telephone Co. v. Lundy*, 17 N.Y.2d 373, 271 N.Y.S.2d 216, 218 N.E.2d 274 (N.Y. 1966).

The language in these cases indicates that courts using the traditional approach do not agree as to (1) what constitutes proof of a just and reasonable price and (2) whether the commission or the court should initially set forth the standard for determining what constitutes a just and reasonable price. Some courts which hold that a showing of equal prices charged to non-affiliates by itself establishes reasonableness apparently would define "just and reasonable" in terms of the good faith of the utility. For instance, the court in *State v. General Telephone Co.*, 281 N.C. 318, 189 S.E.2d 705, 724 (1972), held that "there is no substantial evidence in this record to support a finding that the prices charged . . . are so excessive as to indicate bad faith or mismanagement by the directors . . . ."

To those courts which hold that profits are controlling, on the other hand, the assumption seems to be that a reasonable price is one that a competitive market would charge. In *Application of Montana–Dakota Utilities Co.*, 278 N.W.2d 189, 191 (S.D. 1979), for instance, the court affirmed the commission's conclusion that "the utility did not meet its burden of proving the reasonableness of [the subsidiary's] profits primarily because of the lack of a truly competitive market."

There is a similar often–undiscussed split among courts as to whether it is for the court or the commission to make the initial

determination of the standard for determining what constitutes a "just and reasonable price." Many cases reversing a commission finding of unreasonableness simply do not discuss this question. *E. g., State v. General Telephone Co.*, 281 N.C. 318, 189 S.E.2d 705 (1972); *Montana–Dakota Utilities Co. v. Public Service Commission*, 102 N.W.2d 329 (N.D. 1960). Those cases which discuss the issue, however, generally find that it is for the Commission to initially set the standard, and for the court to determine whether that standard is arbitrary. As stated in *Application of Montana–Dakota Utilities Co.*, 278 N.W.2d 189, 191 (S.D. 1979),

> "In determining reasonableness, the Commission is not restricted to any single formula in arriving at the rates fixed . . . 'so long as the method followed and the order entered when applied to the facts and viewed as a whole do not produce an unjust or arbitrary result.' *N.W. Pub. Serv. v. Cities of Chamberlain, etc.*, 1978, S.D., 265 N.W.2d 867, 872."

Thus the court in *Pacific Northwest Bell Telephone Co. v. Sabin*, 21 Or.App. 200, 534 P.2d 984, 996 (1975), in upholding the Commission's apparent adoption of the California approach, stated that "where . . . a regulatory agent has been granted broad legislative authority he is not obligated to employ any single formula or combination of formulas to determine what are in each case 'just and reasonable' rates."

Similarly, the court in *State v. Public Service Commission*, 537 S.W.2d 655 (Mo. App. 1976), in holding that the Commission could reject the standard put forth by the utility (that comparative prices are controlling) and adopt its own standard (there that "the profitability of the transactions should be the measure of their reasonableness"), stated the following:

> "Inasmuch as the commission's rejection of the test advanced by Midwest was based upon competent and substantial evidence of record, the adoption by the commission of a different measure of the reasonableness of the expenditures in

---

**2.** Note that the question is not whether the profits are fair as compared to the utility, but whether they are fair as compared to similar businesses.

575

question cannot be said to have been arbitrary or capricious or unauthorized by law. If the commission has the power and duty to inquire into the reasonableness of the transactions in question, the commission, as the repository of the legislative rate–making power entrusted to it, has the right to determine a reasonable standard of judgment consistent with statutory and constitutional limitations. The limited authority of a court upon judicial review of the commission's action does not encompass a substitution by the reviewing judicial authority of its judgment for that of the commission." *Id.* at 664.

We agree with those cases which hold that this determination is initially for the Commission. In *Citizens Utilities Co. v. Idaho Public Utilities Commission,* 99 Idaho 164, 173, 579 P.2d 110, 119 (1978), we held that "questions of 'cost of equity' and 'rate of return' are matters which raise extremely complicated issues," and that "[d]eciding these questions is a function of the Idaho Public Utilities Commission and these questions are within the Commission's area of expertise." Similarly, the adoption of a standard for determining the reasonableness of payments to an affiliate raises many complex issues, as demonstrated by the varied ways courts have approached this question. We feel these matters are best left for the Commission to deal with initially. This is consistent with our statement in *Boise Water Corp. v. Idaho Public Utilities Commission,* 97 Idaho 832, 838, 555 P.2d 163, 169 (1976), in reference to payments to an affiliate, that "[t]he Commission had discretion to rule that it was not persuaded by the Company's evidence that those charges were reasonable."

IV.

Obviously, however, the discretion given the Commission is not absolute. The scope of appeal from decisions of the Idaho Public Utilities Commission is set forth in I.C. § 61–629 as follows: "The review on appeal shall not be extended further than to determine whether the commission has

regularly pursued its authority, including a determination of whether the order appealed from violates any right of the appellant under the constitution of the United States or the state of Idaho . . . ." However, in regularly pursuing its authority the Commission must enter adequate findings of fact based upon competent and substantial evidence. *See Boise Water Corp. v. Idaho Public Utilities Commission,* 97 Idaho 832, 555 P.2d 163 (1976); *Hartwig v. Pugh,* 97 Idaho 236, 542 P.2d 70 (1975). Thus "[a]n order based upon a finding made without evidence . . . or upon a finding made upon evidence which clearly does not support it . . . is an arbitrary act against which courts afford relief." *Oregon Shortline Railroad v. Public Utilities Commission,* 47 Idaho 482, 484, 276 P. 970, 971 (1929). Without proper findings, review would be impossible, and "[a]dministrative expertise would . . . be on its way to becoming 'a monster which rules with no practical limits on its discretion'. . . ." *Baltimore & Ohio Railroad v. Aberdeen & Rockford Railroad,* 393 U.S. 87, 92, 89 S.Ct. 280, 283, 21 L.Ed.2d 219 (1968).

Not only must the Commission make and enter proper findings of fact, but it must set forth its reasoning in a rational manner.

"If there is to be any meaningful judicial scrutiny of the activities of an administrative agency—not for the purpose of substituting judicial judgment for administrative judgment but for the purpose of requiring the administrative agency to demonstrate that it has applied the criteria prescribed by statute and by its own regulations and has not acted arbitrarily or on an ad hoc basis—we must require that its order clearly and precisely state what it found to be the facts *and fully explain why those facts lead it to the decision it makes." Home Plate, Inc. v. OLCC,* 20 Or.App. 188, 530 P.2d 862, 863 (1975) (emphasis added).

*Accord, Publishers Paper Co. v. Davis,* 28 Or.App. 189, 559 P.2d 891 (1977). We stated in *Boise Water Corp. v. Idaho Public Utilities Commission,* 97 Idaho 832, 840, 555 P.2d 163, 171 (1976), "[w]hat is essential are

sufficient findings to permit the reviewing court to determine that the Commission has acted non–arbitrarily." The Commission must similarly set forth its reasoning if we are to be able to adequately review its orders. *See generally* 2 Davis, Administrative Law Treatise § 16.12 (1958).

## V.

In the present case, the Commission, although it maintains that its decision is defensible under either the California or the traditional approach, also states that it has not abandoned the traditional approach. In *Pacific Telephone & Telegraph Co. v. Public Utilities Commission*, 62 Cal.2d 634, 44 Cal. Rptr. 1, 18, 401 P.2d 353, 370 (1965), the California court noted that the determination to limit the subsidiary's return to that of the utility was based "not only on extensive findings made by the commission on the subject but also on the methods and principles theretofore followed by the commission . . . and as the commission expressly found herein, [that determination] produces a fair and reasonable result." Since there are no such findings here, and since neither party is advocating that we adopt the California approach, we decline to consider whether the adoption of that approach by the Commission would be arbitrary, and we will confine our review of the Commission's decision to a discussion of whether the Commission's decision was arbitrary under the traditional approach.

Under the traditional approach, it is unquestioned that the utility has the initial burden of showing prima facie the reasonableness of its operating expenses. *Boise Water Corp. v. Idaho Public Utilities Commission*, 97 Idaho 832, 555 P.2d 163 (1976). In the case of payments to an affiliate, moreover, unlike in the case of payments to a non–affiliate, a mere showing of actual incurrence of the expense does not establish a prima facie case of reasonableness. *Id.* at 836–38, 555 P.2d at 167–69.

Here WWP introduced evidence showing the following: (1) that the price charged by WIDCo for coal is one–half that of the nearest alternative supplier; (2) that the price per million BTU's for WIDCo's coal was 71.7 cents as compared to the average for the United States of 93.6 cents per million BTU's; (3) that WWP had no vote on adjustments to the price of WIDCo's coal; (4) that the WIDCo coal price is subject to negotiation between WIDCo and the six independent owners of Centralia; (5) that those independent owners can demand arbitration or a forced sale; (6) that WIDCo lost money on its coal sales in 1971, 1972 and 1974; (7) that WIDCo has realized only a 3.07% return on its average investment between 1972 and 1976; and (8) that WIDCo's mining operations entail a greater degree of investor risk that WWP's utility operations.

The Commission found, however, that the price comparisons were meaningless, that WIDCo had no greater risk than WWP, and that even if this was an arm's–length transaction, with which argument the Commission had difficulty, that factor was not controlling.

First, as to the price comparisons, the Commission found that the differences between this mine and other mines made the comparisons meaningless. For instance, although the cost to the Centralia plant of the nearest alternative supply of coal was twice that of WIDCo coal, if transportation costs were eliminated the alternative supply would be cheaper. Similarly, the national average price included underground mines, mines with a great deal of overburden, and all transportation costs. We cannot say that the Commission abused its discretion in holding that it was unpersuaded by these comparisons.

As to the finding that WIDCo carried no greater risk than WWP, evidence in the record showed, and the Commission found, that WIDCo had a guaranteed market, no transportation cost, a ·long–term contract with regular price increases, no effective competition, and that these coal properties were originally acquired with the intent to supply this power plant. Our task here is not to weigh the evidence, but only to determine whether there is substantial,

competent evidence to support the Commission's finding. We find that there is such evidence.

 The Commission's findings on the presence and effect of arm's–length negotiations, however, are more troublesome. The only "finding" by the Commission on the *presence* of arm's–length negotiations was the following statement in Order No. 13963, which order denied WWP's petition for rehearing:

"We have difficulty imagining the existence of an arm's–length transaction when the President of the Washington Water Power Company is also the President of the Washington Irrigation and Development Company. Moreover, there was no proof that the other persons who vote on the price of WIDCo coal have any interest in protecting Washington Water Power's ratepayers. Nor was it indicated in any way that the other participants had either the competence, the ability, the time or the desire to oppose any increase in the price of coal which would take effect of the semiautomatic six month provision."

The other owners of Centralia apparently have no connection with WWP, and we will not assume collusion in a non–affiliated transaction. The Commission neither presented evidence nor made findings sufficient to hold that these negotiations were not conducted at arm's length.[3] *See Boise Water Corp. v. Idaho Public Utilities Commission*, 97 Idaho 832, 555 P.2d 163 (1976); *Rhode Island Consumers' Council v. Smith*, 111 R.I. 232, 319 A.2d 643 (1974); *Rhode Island Consumers' Council v. Smith*, 111 R.I. 271, 302 A.2d 757 (1973).

Nonetheless, the Commission in its original order held simply that the presence of arm's–length negotiations was not controlling, "[r]ather, the chief concern is not the level of price, but instead the level of earnings by the unregulated arm of the utility

at a rate higher than the utility is authorized and would be allowed to achieve if no corporate device were utilized. The wholly owned affiliate should be in the same position as an integrated producing arm of a utility." This language can only be read as an implicit adoption of the California approach, which holds that integrated arms of a utility are to be treated as a part of the utility, and allowed the same rate of return. Under the traditional approach, there is no concern over the comparative earnings of the subsidiary and the utility itself; rather, the concern is over the level of earnings of the subsidiary as compared to similar enterprises. Yet the Commission maintains that it has not adopted the California approach, and in its order it also stated that it was merely fixing an alternative price for the coal because WWP had failed to meet its burden of proof.

The Commission also stated in its order that:

"Where uncontested evidence discloses (1) that a utility has purchased the bulk of its necessary coal supplies from an 'affiliated manufacturer', and (2) that due to the affiliated relationship the supplier enjoys a unique position of market power which renders a comparison of its prices and profits with other suppliers inadequate as a measure of the reasonableness of the utility's payments to it, the commission may disallow from the utility's rate base for operating expenses those portions of the utility's payments which represent a return to the manufacturer greater than that allowed the utility itself."

At another point, the Commission stated that "[t]he real question is what would a different entity charge for mining the coal at the Lewis County coal fields." As to the first statement, again this presumes the adoption of the California approach.[4] As to

---

3. It seems to us that the key here is how the original contract establishing the base price was established. However, both parties discuss only how price adjustments are arrived at.

4. Note that in its statement the Commission said that "due to the affiliated relationship the

supplier enjoys a unique position of market power." There was no evidence that WIDCo enjoyed market dominion because of its affiliation; any dominance was due to its geographic location.

the second statement, we fail to understand it. Given the lack of competition, a different entity would have no incentive to charge less than WIDCo. It is possible that the Commission intended to hold that arm's-length negotiations are not controlling in a non-competitive market, and that this was not a competitive market, and that since there was no evidence of what a competitive price would have been, WWP failed to sustain its burden. However, the Commission did not so find, and it is not our role to read meaning into the Commission's order.

Finally, the Commission argues on appeal that to sustain its burden of proof, WWP had to introduce comparative profits, and that since WWP introduced no such evidence, it has failed to meet its burden of proof. However, the Commission made no mention of this factor in its order. Instead, the Commission implied that, due to the affiliated relationship between WWP and WIDCo, there could be no meaningful comparison of prices and profits. The Commission would apparently find that all comparative profits are meaningless, but a failure to introduce any such comparisons equals a failure to make out a prima facie case.

The South Dakota Supreme Court was faced with a factual situation similar to the one now before us in *Application of Montana–Dakota Utilities Co.*, 278 N.W.2d 189 (S.D. 1979). In that case, Montana–Dakota Utilities (MDU) purchased from its wholly owned subsidiary, Knife River, all the coal it needed to produce electricity. Knife River sold 33% of its coal to MDU and 67% to other purchasers. MDU contended that the price it paid for the coal was reasonable because it paid less than the other purchasers of Knife River coal and because of the two "independent yardsticks" which determined the price MDU paid. These two yardsticks were (1) that MDU would not pay more than other Knife River customers and (2) that MDU would monitor other coal producers and purchase from them if their prices were lower than Knife River's. MDU also presented evidence that its profits were reasonable.

The Commission there held that MDU had not met its burden of showing reasonableness primarily because of the lack of a truly competitive market. The court held that "there is substantial evidence on the record to support the conclusion that true competitive market conditions did not exist between MDU and Knife River and that the prices and profits derived therefrom paid to Knife River as a part of the revenue requirements in the MDU application are unreasonable . . . ." 278 N.W.2d at 192. In reaching this conclusion the court discussed the following factors: (1) that the coal is being developed slowly to ensure MDU a continuing supply, while a more rapid development might mean lower prices; (2) the yardsticks for MDU's price determination remove it as a bargaining factor, and, since MDU is a major buyer and Knife River dominates the local market, the competitive market price effects are dampened; (3) Knife River can't sell coal further than fifty miles outside of North Dakota; (4) that the primary obligation of Knife River is to supply MDU with coal, thus further demonstrating that Knife River is not being run entirely as an independent coal company; and (5) the Commission's conclusion that Knife River's prices might be lower if it were truly independent from MDU. (The court then went on to hold that there was no substantial evidence "to support the reasoning and conclusion reached by the Commission that the rate of return allowed for MDU of 11.5% of equity is a reasonable figure for Knife River." 278 N.W.2d at 192.)

The Commission in the present case has not made detailed findings equivalent to those made in *Montana–Dakota Utilities*. In fact, we are unable to say with confidence exactly what the Commission has decided in reaching its ultimate conclusion that WWP has not proven the reasonableness of the price it pays for WIDCo coal. We are unable to discern whether or not it intended to adopt the California approach, and, if so, for what reasons. We are unable

to discern the Commission's findings as to the importance of arm's–length negotiations in an affiliated transaction under the traditional approach, if the traditional approach has been followed. We are unable to determine how the Commission dealt with WIDCo's low earnings in prior years. In fact, we are unable to tell exactly what standards for determining a just and reasonable price the Commission has chosen to follow.

■ Since we cannot determine that the Commission's reasoning and conclusion are rational, we must therefore set it aside. *Bunker Hill Co. v. Washington Water Power Co.*, 98 Idaho 249, 561 P.2d 391 (1977); *Intermountain Gas Co. v. Idaho Public Utilities Commission*, 97 Idaho 113, 540 P.2d 775 (1975).

### VI.

■ In the event the Commission should alter or amend its order to meet our objections pursuant to I.C. § 61–629, we shall briefly discuss the other issues raised by WWP. First, WWP argues that the Commission's ruling in 1970 that WIDCo's bonds and contracts were not subject to the Commission's jurisdiction precludes the Commission from now limiting WIDCo's return to that of WWP. As stated in 2 Davis, Administrative Law Treatise § 18.09 at 610 (1958), "[w]hen the purpose is one of regulatory action, as distinguished from merely applying law or policy to past facts, an agency must at all times be free to take such steps as may be proper in the circumstances irrespective of its past decisions. Even when conditions remain the same, the administrative understanding of those conditions may change, and the agency must be free to act." So long as the Commission enters sufficient findings to show that its action is not arbitrary and capricious, the Commission can alter its decisions. *See State v. Public Service Commission*, 537 S.W.2d 655, 661–662 (Mo.App. 1976); *Pacific Northwest Bell Telephone Co. v. Sabin*, 534 P.2d 984, 997 (Or.App. 1975).

■ Finally, WWP argues that it was improper to limit WIDCo's return to the same as WWP, and that it was improper to restrict WWP's shareholders to an arbitrary return on their investment in WIDCo while rewarding WWP's ratepayers for a risk they did not assume. WWP is not suggesting that the Commission cannot scrutinize transactions between WWP and WIDCo, but rather is asserting that once it shows that the prices are reasonable, the Commission may not adjust those prices. With this we agree. However, if the prices are properly found to be unreasonable, then the Commission can adjust that price. In the present case, since there was substantial and competent evidence to support the finding that WIDCo bears no greater risk than WWP, we do not feel that it would be arbitrary and capricious for the Commission to adopt as a reasonable price that price which would allow WIDCo the same return as WWP, if the price paid for WIDCo coal is properly found to be unreasonable.

WWP cites *Boise Water Corp. v. Idaho Public Utilities Commission*, 99 Idaho 158, 578 P.2d 1089 (1978), where this Court held that since the shareholders had purchased the non–depreciable property, they, rather than the ratepayers, were entitled to the increased value of the property when it was sold. That case is clearly distinguishable from the present one. The question here is not who gets the benefits from the increased value of a piece of property, but whether the charges by the affiliate are reasonable. If they are not, then, should it be shown by substantial competent evidence that the subsidiary has no greater risk than the utility, the Commission does not abuse its discretion in limiting the subsidiary's rate of return to that of the utility. We express no opinion on whether this would be proper if the utility had introduced evidence of comparable earnings of similar mining operations, as that question is not presented in this case.

No costs allowed.

DONALDSON, C. J., SHEPARD and McFADDEN, JJ., and WALTERS, J., Pro tem., concur.