Dear Representative Reynolds,
¶ 0 This office has received your request for an official Attorney General Opinion in which you ask, in effect, the following questions:
1. Are the current and future pension payments made by theState retirement systems to retirees actual or moral obligationsof the State of Oklahoma?
 2. If the Oklahoma Legislature increases benefits in the stateretirement systems without increasing funding to pay for theenhanced benefits, are such actions subject to the debtlimitations of Article X, Section 23 of the OklahomaConstitution?
 3. If the Oklahoma Legislature increases benefits in thesesystems without increasing funding to pay for the enhancedbenefits or fails to provide sufficient funding to keep theretirement systems actuarially sound, do such actions constitutean impairment of a contract under the Oklahoma or United StatesConstitutions?
 4. May the Oklahoma Legislature borrow or appropriate fundsalready in these retirement system funds to divert for otherpurposes?
 5. If the Oklahoma Legislature may indeed borrow orappropriate funds already in these retirement systems to divertfor other purposes, would such an action of diverting pensionassets be subject to the debt limitations of Article X, Section23 of the Oklahoma Constitution since assets set aside to pay theobligations would be diminished?
¶ 1 Your questions deal with the legal limitations on the Oklahoma Legislature as to the State retirement systems ("Retirement Systems").[1] Are obligations of Retirement Systems to make payments to retirees now or in the future "actual obligations" of the State? What are the effects of, or limitations on, the Legislature increasing benefits under these systems without increasing funding to pay for these enhanced benefits? To what extent, if any, may the Legislature divert funds in these Retirement Systems to other uses?
 Constitutional Provisions
¶ 2 Article XXIII, Section 12 of the Oklahoma Constitution was adopted in 1992[2] and provides as follows:
 All the proceeds, assets and income of any public retirement system administered by an agency of the State of Oklahoma shall be held, invested, or disbursed as provided for by law in trust for the exclusive purpose of providing for benefits, refunds, investment management, and administrative expenses of the individual public retirement system, and shall not be encumbered for or diverted to any other purposes.
Id.
¶ 3 While not construed in any reported cases to date, this provision, by its terms, prohibits diverting Retirement System funds to other purposes and mandates that all monies in such funds must be held in trust for the exclusive purposes of providing benefits or refunds, and paying management and administrative expenses.
¶ 4 Article X, Section 23 of the Oklahoma Constitution to which you refer to is the "budget balancing" provision which, in pertinent part, provides:
 The state shall never create or authorize the creation of any debt or obligation, or fund or pay any deficit, against the state, or any department, institution or agency thereof, regardless of its form or the source of money from which it is to be paid, except as may be provided in this section and in Sections 24 [relating to debts to resist insurrection, invasion or war] and 25 [requiring voter approval] of Article X of the Constitution of the State of Oklahoma.
Id. See In re Bd. of Regents, 167 P.2d 883, 883-84 (Okla. 1946); In re Okla. Planning Res. Bd., 203 P.2d 415, 419
(Okla. 1949). Article X, Section 25 requires a vote of the people to authorize the State to incur a debt past the current fiscal year.
¶ 5 On impairment of contracts, the United States Constitution, Article I, Section 10, Clause 1 prohibits states from enacting laws impairing contracts, and Oklahoma Constitution Article II, Section 15 provides:
 No bill of attainder, ex post facto law, nor any law impairing the obligation of contracts, shall ever be passed. No conviction shall work a corruption of blood or forfeiture of estate: Provided, that this provision shall not prohibit the imposition of pecuniary penalties.
Id.
¶ 6 Oklahoma Constitution Article V, Section 54 also provides:
 The repeal of a statute shall not revive a statute previously repealed by such statute, nor shall such repeal affect any accrued right, or penalty incurred, or proceedings begun by virtue of such repealed statute.
Id. (emphasis added). The nature of such "accrued rights" will be more fully discussed later in this Opinion.
 The Nature of Pension Obligations
¶ 7 Your first question indicates concern over whether the State's obligations (present and future) to make pension payments under the Pension Laws are enforceable, and whether there is a distinction between an "actual" and a "moral" obligation. The Oklahoma Supreme Court held the primary purpose for enacting the Public Employees Retirement System Act was to provide a retirement system for public employees, and the enactment created a mandatory obligation on public officials to set up such a plan.Bd. of County Comm'rs v. Okla. Pub. Employees Ret. Sys.,405 P.2d 68, 72-73 (Okla. 1965) [hereinafter Public Employees].
¶ 8 Title 74 O.S. Supp. 2004, § 923[74-923],[3] captioned "Protection of vested rights — Exemption of benefits from legal process — Offset," in pertinent part provides:
 A. Except as otherwise provided by this section, no alteration, amendment or repeal of this act shall affect the then existing rights of members and beneficiaries, but shall be effective only as to rights which would otherwise accrue hereunder as a result of services rendered by an employee after such alteration, amendment or repeal.
Id. Thus, the obligation of the State to pay pension benefits is fixed as to a person earning such benefits under the law on his or her retirement date, notwithstanding changes or repeal of such pension laws after retirement. See Alldredge v. Okla.Firefighters Pension Ret. Bd., 816 P.2d 580, 582
(Okla.Ct.App. 1991). However, there can be no guarantee that pension laws (or pension benefits) will not be changed, as one Legislature cannot bind a subsequent body as to its enactments. In re Okla.Capitol Improvement Auth., 958 P.2d 759, 774 (Okla. 1998) [hereinafter 1998 OCIA]. In Attorney General Opinions 95-45 and 96-21, the author discussed at length the restraints on legislative changes to pension laws, concluding that the Constitution and Section 923(A) of Title 74 prohibit the Legislature from retroactively changing pension formulas as to members of retirement systems who have acquired "vested rights" or "service vested" benefits, but allowing the Legislature to amend or modify pension laws in a prospective fashion. A.G. Opins. 95-45, at 115, 119; 96-21, at 60-61.
¶ 9 "Vested rights" or "accrued rights" for purposes of the State Constitution are rights that have matured and become enforceable, notwithstanding the later repeal or amendment of the act under which the right is acquired. Baker v. OklahomaFirefighters Pension and Retirement System, 718 P.2d 348,350-51 (Okla. 1986) held that the right of an Oklahoma public employee to a pension would "vest" or become absolute upon the pension recipient's becoming eligible for payment of the pension. A "vested right" is "substantially a property right, and may be created either by common law, by statute, or by contract." Id.
at 350 (quoting Baker v. Tulsa Bldg. Loan Ass'n, 66 P.2d 45
(syllabus ¶ 1) (Okla. 1936)). Baker further held that the state pension plan had characteristics of a contract, but the contract would not become enforceable unless and until the pension vested.Id. at 352. Meanwhile, however, pension rights may be changed at any time before they become vested. Id.
¶ 10 In a prior Attorney General Opinion this office noted that in 1992 the Oklahoma Supreme Court, for the first time, indicated that "the provisions comprising a public retirement plan constitute an employment contract and can" set out or "alter the circumstances under which its members acquire vested or absolute rights." A.G. Opin. 95-45, at 115 (citing Woods v. City ofLawton, 845 P.2d 880, 882-83 (Okla. 1992)).
¶ 11 Taylor v. State and Education Employees Group InsuranceProgram, 897 P.2d 275, 279-80 (Okla. 1995) held that while public employees' pension rights are contractually based and are trust funds, the Legislature may modify them if modification is necessary and reasonable, and if any disadvantages employees suffer through changes are offset by new advantages; however, modifications cannot impair actuarial soundness of the fund or detrimentally affect vested rights, which are matters of proof.Id.
¶ 12 In Attorney General Opinion 95-45 we concluded that pursuant to Section 923(A) of Title 74, upon completing eight (8) years of credited service with the Oklahoma Public Employees Retirement System ("OPERS"), then-current OPERS members acquired non-forfeitable "service vested" rights either to elect a pension or receive contributions in lieu of pension benefits upon leaving State employment. See A.G. Opin. 95-45, at 122-24. Until that time OPERS members possessed only "contractually based" rights to a substantial or reasonable pension. Thus, members of OPERS, after 8 years of credited service, also acquired a species of non-forfeitable rights which may not be altered by the Legislature.
¶ 13 There is a close connection between a "vested" or "matured" right and an "enforceable obligation." In Johnson v.Home State Bank, 501 U.S. 78, 83 (1991) Justice Marshall, speaking for the Court, said that for purposes of the bankruptcy laws, a "`right to payment' [means] nothing more nor less than an enforceable obligation. . . ." Id. (quoting Pa. Dep't of Pub.Welfare v. Davenport, 495 U.S. 552, 559 (1990)). Thus, in a context of a lawful right of a person to be paid an amount by the State, there exists a corresponding obligation of the State to pay it, and a duty on the part of the public official whose job it is to pay such claims to see it is paid. See CommercialNat'l Bank v. Robinson, 168 P. 810, 811 (Okla. 1917); Stateex rel. Shepard v. Crouch, 120 P. 915, 916 (Okla. 1912).
¶ 14 For purposes of application of the pension laws, we conclude that an "actual obligation" means the same thing as an "enforceable obligation," and corresponds to a "vested" or "matured" right to payment. Thus, the State has an actual or enforceable obligation to make pension payments to persons who have retired, or whose right to retire and receive a pension has vested. Okla. Const. art. II, § 15; Okla. Const. art. V, § 54; Okla. Const. art. XXIII, § 12; 74 O.S. Supp. 2004, § 923[74-923](A) ;Baker, 718 P.2d at 350-51. Since the obligation is an actual one, i.e., a legally enforceable obligation of the State, we need not address whether a "moral obligation" is involved.[4]
 Unfunded Pension Liabilities And Balanced Budget Requirements
¶ 15 In your second question you ask, in effect, whether actions of the Legislature increasing benefits in the Retirement Systems without providing a corresponding means of funding such enhanced benefits (i.e., creating an unfunded liability) violate the Oklahoma Constitution's "balanced budget" provisions in Article X, Sections 23 and 25.
¶ 16 In Attorney General Opinion 96-21 we concluded that by adoption of the various laws creating the Retirement Systems, the Legislature has statutorily obligated the State to actuarially maintain the funding of its public retirement plans. Id. at 74. Further, Attorney General Opinion 96-21 concluded that the State is required to both fund the unfunded actuarial accrued liability of its public Retirement Systems to a level of "actuarial soundness," and amortize the unfunded liability of each system at the rate and term required in the individual system's statutes.Id. However, this Opinion was based on an "impairment of contract" analysis and not from the consideration of the State's balanced budget restrictions. Id. at 61. Opinion 96-21 cited Attorney General Opinion 81-53 for the proposition that the Legislature does not have to provide funds to fully and currently amortize anticipated costs of a legislative program for future years, and cited an Arizona case, Rochlin v. State,540 P.2d 643, 648 (Ariz. 1975), for the proposition that obligations which have not been voluntarily incurred but have been imposed by state law are not "debts" in the constitutional sense. Id. at 57-58.
¶ 17 No fewer than 48 of the 50 states have a "balanced budget" provision, either in their Constitutions or state statutes.[5] Notwithstanding the strong budget balancing requirements set out in state law, courts in most, if not all, states have been reluctant to find a violation of "borrowing" requirements when legislators borrow from, or underfund, a state pension system.[6] Borrowing from or under-funding public pension systems, leaving the systems in an actuarially unsound condition, arguably are forms of deficit spending and amounts borrowed from, or not properly dedicated to, pension systems must eventually be repaid by taxpayers.[7] Authors of recent law review articles have concluded such practices amount to a short-term political solution to a long-term problem. See n. 7.
¶ 18 Oklahoma Constitution Article X, Section 25 and its counterpart for cities and counties, Article X, Section 26, each requires voter approval before a "debt" may be incurred extending past the current fiscal year.[8] But for many years it has been held that a mandatory obligation imposed by law is not a "debt" within this constitutional restriction. See PublicEmployees, 405 P.2d at 72; Hume v. Wyand, 173 P. 813, 814-15
(Okla. 1918). Public Employees is especially applicable; in that case a county, seeking to have its employees removed from the state's public employee retirement system, claimed participation in the system would require an appropriation to be made for successive fiscal years without authorization by voters, thereby violating Article X, Section 26. Id. at 70. The court ruled against the county, holding the restrictive effect of Article X, Section 26 is inoperable where the contractual obligation is imposed upon a political subdivision by legislative enactment. Id. at 72. In effect, Public Employees represents an Oklahoma court declining to recognize imposition of legislatively-mandated pension funding requirements as a "debt" for purposes of the constitutional voter approval requirement.Id.
¶ 19 By analogy, the same result applies to Article X, Sections 23 and 25, the "balanced budget" provisions for State government. Following the logic of the Hume and Public Employees cases and Attorney General Opinion 96-21, an obligation imposed on the State by legislative fiat is distinguishable from a debt voluntarily incurred by contract and leads to the conclusion that obligations such as pension liabilities imposed on the State by the Legislature are not to be considered "debts" for purposes of Article X, Sections 23 and 25. Therefore, following established law, we conclude your second question must be answered in the negative.
 Legislative Modification of Pension Plans And Impairment of Contract
¶ 20 If the Legislature increases pension benefits without increasing funding to pay for such enhanced benefits or fails to provide sufficient funding to keep the Retirement Systems "actuarially sound," the question arises whether such actions result in unlawful impairment of contracts under the Oklahoma and United States Constitutions. As pointed out in the law review articles of Scott, Simko and Shaw, in at least some states with constitutional balanced budget laws, courts have enforced pension rights and have struck down laws weakening pension systems by application of state and federal "impairment of contract" prohibitions.[9]
¶ 21 As cited earlier, the United States Constitution, Article I, Section 10, Clause 1 prohibits a state from passing a law impairing contracts, and Oklahoma Constitution Article II, Section 15 likewise prohibits passage of laws impairing contracts. Further, Oklahoma Constitution Article V, Section 54
provides that repeal of legislation will not impair accrued rights.
¶ 22 In Attorney General Opinion 96-21, we concluded that "[s]hould the State of Oklahoma fail to fund the unfunded actuarial accrued liability of any of its public retirement systems to a level which would prevent a system from amortizing its unfunded [actuarial] accrued liability at the rate and term required by a system's statutes, or should the State allow a System to become `presently and actuarially unsound,' such a failure would constitute an impairment of contractual rights between the State and the public employee members of the affected system." Id. at 74 ¶ 3 (citation omitted).
¶ 23 From the earlier discussion, while a state employee with less than 8 years of service may have an expectation of eventually receiving pension benefits for state service, and state legislators and agency officials may feel a "moral obligation" to provide such benefits, it is only those employees who have worked long enough to acquire "service vested rights" or who have actually retired and have begun to receive benefits who have protected interests.
¶ 24 Despite the plain constitutional language prohibiting impairment of contracts or accrued rights thereunder, it has been held that under proper circumstances, the Legislature may modify pension plans in ways that potentially affect persons with "vested rights." See A.G. Opins. 95-45, at 117-22; 96-21, at 58-71. In Taylor the Legislature transferred almost $40 million from the Teachers Retirement System of Oklahoma to the Education Employees Group Insurance Reserve Fund. Taylor, 897 P.2d at 277. This action was challenged by education employees on various constitutional grounds, including an assertion that the transfer violated impairment of contracts prohibitions in the Oklahoma and United States Constitutions. Id. The court, citing UnitedStates Trust Co. v. New Jersey,[10] upheld the transfer as constitutionally permitted, holding that even though public employees' pension rights are contractually based and involve trust funds, the Legislature may modify those rights if necessary and reasonable, and if any disadvantages employees suffer through changes are offset by new advantages; however, modifications cannot impair actuarial soundness of the fund or detrimentally affect vested rights, which are matters of proof. Id.897 P.2d at 279. Taylor further relied on a federal case, MarylandState Teachers Association v. Hughes, 594 F. Supp. 1353 (D. Md. 1984), where the court held a change in the Maryland teachers retirement plan was appropriate because the changes in benefits were prospective only and were necessary to preserve the fiscal integrity of the system. Taylor, 897 P.2d at 279. Under the particular facts presented, Taylor found the transfer of money from one fund to another satisfied an important public purpose and did not harm the fiscal integrity of the system, in that education employees participated in both pension and health insurance plans, and such transfer would help guarantee that, for the first time, education employees would have health insurance plans. Id. at 280. Thus, education employees would not be prejudiced by the legislative action.
¶ 25 The Taylor decision created an "Oklahoma Rule" for legislative modifications to pension plans. The Legislature may modify such plans if "modification is necessary and reasonable, and any disadvantages employees suffer . . . are offset by new advantages. . . . Such modifications . . . do not impair the actuarial soundness of the fund, or detrimentally affect vested rights." Id. at 279.
¶ 26 There is no definition in Oklahoma law for the term "actuarially sound" or "actuarial soundness," although the concept was discussed at some length in A.G. Opin. 96-21. Id.
at 52-54. While one statute dealing with health benefit plans for State employees, 74 O.S. Supp. 2004, § 1371[74-1371](H), requires that contracts with private providers must include a risk adjustment factor "based on generally accepted actuarial principles," the italicized phrase is not defined. Id. (emphasis added). InPacificare v. Oklahoma Health Care Authority Board,25 P.3d 930, 934-35 (Okla.Ct.App. 2001), a case involving interpretation of Section 1371(H), one of the parties offered a definition of an actuary's role:
 HMO defines the actuary's role as a mathematician, whose function is to develop, analyze, and evaluate formulas which determine probabilities enabling the actuary to compensate for and equate such cost differences as may have been found to exist in the population based upon an unbiased database.
Id. at 934. However, in affirming the trial court's decision, the appellate court declined to find that the statute required a particular method or means to determine whether cost adjustments were needed. Id. at 935.
¶ 27 While case law provides that maintaining "actuarial soundness" is a requirement for the Legislature being able to modify pension plans, (see Taylor, 897 P.2d at 279; A.G. Opin. 96-21, at 60), there is no statute expressly requiring State pension plans to meet this standard. As stated earlier, underTaylor, the determination of whether a legislative change impaired "actuarial soundness" is a matter of proof. Under theHughes case cited in Taylor, changes to the teachers retirement plan were approved where such changes are necessary to preserve the "fiscal integrity" of the system. Taylor,897 P.2d at 279. Thus, "actuarial soundness" may be construed as similar to "fiscal integrity." Id.
¶ 28 We conclude that although employee pension funds are trust funds, the question of whether a particular action adversely affects the fiscal integrity or "actuarial soundness" of the system is a fact question to be determined by a court on a case-by-case basis. See A.G. Opin. 96-21, at 64-65. Accordingly, whether a pension plan is, or is not, "actuarially sound" is a fact question beyond the scope of an Attorney General's Opinion. 74 O.S. 2001, § 18b[74-18b](A)(5).
¶ 29 If impairment of "actuarial soundness" has been properly determined to result from the Legislature's increase in benefits without a corresponding increase in funding to pay for such enhanced benefits, under Taylor and A.G. Opin. 96-21 the Constitution's prohibition against impairment of contract rights will have been violated. While not a part of the court's holding, it is significant that in a footnote the court said:
 Maintaining a stable and reliable teachers' retirement system is a fundamental part of the Legislature's obligation under the constitution.
Taylor, 897 P.2d at 279 n. 4. Similar statements could well be made about the Legislature's obligation to see that the health, safety and general welfare of the State's residents are protected, in part through maintaining a stable and reliable retirement system for law enforcement personnel, firefighters and other State employees. Thus, the point of the Taylor decision is that the financial integrity of the State's employee pension systems may not be unreasonably impaired. Id. at 280.
¶ 30 Whether employees' pension rights have been unreasonably
impaired by Legislative action in violation of the Oklahoma Rule is a question of fact, and thus a matter for decision of the courts, not the Attorney General. 74 O.S. 2001, § 18b[74-18b](A)(5).
 Diversions of Retirement Funds
¶ 31 In your fourth question you ask whether the Oklahoma Legislature may borrow or appropriate funds already in public employee retirement system funds to divert for other purposes. In light of the Constitution's proclamation that "All the proceeds, assets and income of any public retirement system administered by an agency of the State of Oklahoma . . . shall not be encumbered for or diverted to any other purposes" (Okla. Const. art. XXIII, § 12), to ask the question is almost to answer it. Taylor cited examples from California and West Virginia to show that suspension by the Legislature of State payments into a public employees' retirement plan, or underfunding a retirement fund so that money could be diverted for road paving, will not be permitted under the Oklahoma Rule. Diversion or encumbrance of money already in a public employee retirement system fund for another purpose is plainly prohibited by our State's Constitution. Since your fourth question is answered in the negative, we need not address your fifth question.
¶ 32 It is, therefore, the official Opinion of the AttorneyGeneral that:
 1. (A) Two types of rights of public employees with respect to pension benefits are protected under Oklahoma law: (1) "absolute" rights of employees who have retired or become eligible to retire and receive pension benefits; and (2) "service vested" rights created by statute which become enforceable and non-forfeitable once employees have completed their applicable service eligibility requirements. Such rights (or "actual obligations" of the State) may not be impaired under provisions of Oklahoma Constitution Article II, Section 15, United States Constitution Article I, Section 10, Clause 1, and 74 O.S. Supp. 2004, § 923(A). Baker v. Okla. Firefighters Pension Ret. Syt. 718 P.2d 348, 350-51 (Okla. 1986); A.G. Opins. 95-45, 96-21.
 (B) A third type of right, i.e., a "contractually based" right exists by virtue of the employment of persons by the State, creating the expectation of a substantial or reasonable pension upon completion of eligibility requirements. Woods v. City of Lawton, 845 P.2d 880, 882 (Okla. 1992); A.G. Opins. 95-45, 96-21. Such contractually based, yet pre-vested rights, may be modified by the Legislature provided the changes are reasonable and necessary. Taylor v. State Educ. Employees Group Ins. Program, 897 P.2d 275, 279 (Okla. 1995).
 2. Oklahoma Constitution Article X, Sections 23 and 25 and their counterpart for cities and counties, Article X, Section 26, each require voter approval before a "debt" may be incurred extending past the current fiscal year; however, a mandatory obligation imposed by law is not a "debt" within this constitutional restriction. Bd. of County Comm'rs v. Okla. Pub. Employees Ret. Sys., 405 P.2d 68, 72 (Okla. 1965); Hume v. Wyand, 173 P. 813, 814-15 (Okla. 1918). Thus, under existing case law, a mandate from the Legislature that pension benefits be increased without a corresponding increase in funding does not create a "debt" in violation of the constitutional balanced budget provisions.
 3. Oklahoma case law requires State pension plans to be "actuarially sound." The Legislature may make modifications to pension statutes based on necessity, but only if they do not impair the fiscal integrity of the fund or detrimentally affect vested rights. Taylor v. State Educ. Employees Group Ins. Program, 897 P.2d 275, 279 (Okla. 1995); A.G. Opin. 96-21. The determination of whether a legislative change impairs fiscal integrity or "actuarial soundness" is a matter of proof. Such proof is dependent on matters of fact which cannot be determined in an Attorney General's Opinion. 74 O.S. 2001, § 18b(A)(5).
 4. Article XXIII, Section 12 of the Oklahoma Constitution provides that "[a]ll the proceeds, assets and income of any public retirement system administered by an agency of the State of Oklahoma shall be held, invested, or disbursed as provided for by law as in trust for the exclusive purpose of providing for benefits, refunds, investment management, and administrative expenses of the individual public retirement system, and shall not be encumbered for or diverted to any other purposes." Id. This provision, when combined with provisions in Oklahoma Constitution Article II, Section 15 and United States Constitution Article I, Section 10, clause 1, prohibiting passage of laws impairing contracts, effectively prohibits the Legislature from borrowing money or diverting funds from a public pension system and using the money for another purpose.
 W.A. DREW EDMONDSON Attorney General of Oklahoma
 LYNN C. ROGERS Assistant Attorney General
[1] As discussed in Attorney General Opinion 03-5, the Legislature has obligated the State and its political subdivisions to annually fund six statewide retirement systems, namely:
 [T]he Oklahoma Firefighters Pension and Retirement Board (Fire), 11 O.S. Supp. 2002, § 49-100.9[11-49-100.9](H); the Oklahoma Police Pension and Retirement Board (Police), 11 O.S. Supp. 2002, § 50-105.4[11-50-105.4] (H); the Uniform Retirement System for Justices and Judges (Judges), 20 O.S. Supp. 2002, § 1108[20-1108](B); the Oklahoma Law Enforcement Retirement Board (OLERS), 47 O.S. Supp. 2002, § 2-303[47-2-303] .1(H); the Board of Trustees of the Teachers' Retirement System of Oklahoma (TRS), 70 O.S. Supp. 2002, § 17-106[70-17-106] .1(H); and the Oklahoma Public Employees Retirement System Board of Trustees (OPERS), 74 O.S. Supp. 2002, § 909.1[74-909.1](H).
A.G. Opin. 03-5, at 26 n. 1.
In addition, the Oklahoma Wildlife Conservation Department Retirement Fund is established by 29 O.S. 2001, § 3-306[29-3-306](A). These statutes are referred to collectively as the "Pension Laws."
[2] State Question 645 approved by voters on November 3, 1992, as proposed by S.J. Res. 28, § 1, 43rd Leg., 2nd Reg. Sess. (Okla. 1992).
[3] First enacted in 1963. See 1963 Okla. Sess. Laws ch. 50, § 23.
[4] The term "moral obligation" should be used with great caution in describing pension obligations. While the Oklahoma Supreme Court has discussed the concept of a moral obligation in public finance transactions, see In re Univ. Hosp. Auth.,953 P.2d 314, 325-28 (Okla. 1997) (Kauger, J., concurring); In reOkla. Capitol Improvement Auth., 958 P.2d 759, 768-71 (Okla. 1998), these cases do not stand for the proposition that all "moral obligation" bonds are legal, but only that such bonds do not constitute a "debt" of the State for purposes of the debt limitation in Article X, Section 23 of the Oklahoma Constitution. We question whether the concept applies to enforceability of pension obligations. Ultimately, the State's obligation to make pension payments to qualified retirees is a legal one and whether there is or is not also a moral obligation is, for purpose of this analysis, irrelevant.
[5] Robert Ward Shaw, The States, Balanced Budgets, andFundamental Shifts in Federalism, 82 N.C.L. Rev. 1195, 1195 n. 1 (2004) [hereinafter Shaw].
[6] Darryl B. Simko, Of Public Pensions, State ConstitutionalContract Protection, and Fiscal Constraint, 69 Temp. L. Rev. 1059, 1060 (1996) [hereinafter Simko]. Simko wrote, "More than twenty years ago commentators recognized that the maintenance of a public pension system would create a `potential for abuse unknown in the private sector;' fiscal distress would cause governments to look for relief to the large revenues dedicated to pension funding. Borrowing pension monies and under-funding pension systems are modern realizations of this potential for abuse. The realization of that potential will continue so long as public pension borrowing and under-funding are viewed as a means to finance political objectives in the face of balanced budget constraints and an electorate angered by additional taxation."Id. (footnotes omitted).
[7] Simko, 69 Temp. L. Rev. at 1061; see Ridgeley A. Scott,A Skunk at a Garden Party: Remedies for Participants in Stateand Local Pension Plans, 75 Denv. U.L. Rev. 507, 507-08 (1998) [hereinafter Scott].
[8] 1998 OCIA, 958 P.2d at 768.
[9] See n. 4, n. 5, n. 6.
[10] United States Trust Co. v. New Jersey, 431 U.S. 1
(1977) [hereinafter U.S. Trust] held that before the contract clause can be said to have been violated, three factors must be satisfied: (1) the contractual obligation at issue arose under statute, (2) the state's actions impaired an obligation of that contract, and (3) the impairment was not "reasonable and necessary to serve an important public purpose." Id. at 17-26. Whether a method is "reasonable" should be judged in light of whether the effects which the legislation is seeking to remedy "were unforeseen and unintended by the legislature" when the statute creating those obligations and rights were adopted (id.
at 36); to be considered "necessary," two conditions must be met: first, no other less drastic modification could have been implemented, and second, the state could not have achieved its stated goals without the modification. Id. at 29-30.